KANSAS CITY SOUTHERN RAILWAY COMPANY *v.* TAYLOR.

4-7741                                                190 S. W. 2d 968

Opinion delivered December 10, 1945.

*Hardin, Barton & Shaw* and *Joseph R. Brown,* for appellant.

*Ben Shaver, C. E. Johnson, Cecil E. Johnson, Jr.,* and *Abe Collins,* for appellee.

SMITH, J. Appellee recovered a judgment for $40,000 to compensate a personal injury which he sustained, from which judgment is this appeal.

Appellant states the facts out of which the litigation arose as follows: Appellee was injured February 24, 1944, while employed by appellant as a locomotive fireman. The accident occurred in defendant's Texarkana, Texas, yard about 10:15 p. m. The moon was not shining and the night was dark, but it was not raining.

Defendant's freight train No. 42, operating north between Shreveport, Louisiana, and DeQueen, Arkansas, stopped in the yard to set out some cars and to pick up others. There were in this yard in addition to the main line track, six switch tracks, all of which except switch track No. 6, were connected with the main line track by another track referred to as the lead track, or cross over track.

"After the cars were set out, and while the engine proceeded to the water tank in the north part of the yard, swing brakeman Floyd lined No. 4 switch. He then walked south to switch track No. 3. He shone his lantern light upon a metal hopper, or gravel car, the first car on said switch track No. 3, and concluded the engine on the lead track could pass said hopper car on its backward movement from the water tank to switch track No. 1. He joined conductor Malone and rear brakeman Johnson at switch track No. 1, where the cars to be picked up were spotted.

"Train No. 42's engine No. 804, after taking water, was backed along the lead track, in route to switch track No. 1, at a speed of 5 miles an hour. Since the engine was a road engine, it had no rear headlight. Engineer Thomas received a signal from brakeman Floyd at switch track No. 1, to continue backing. He saw identical signals given by conductor Malone and brakeman Johnson. The signals indicated the lead track was clear. Engineer Thomas relied upon the signals and continued backing his engine.

"Head brakeman White, on the right rear engine-step, on the engineer's side, relayed Floyd's back-up signal. Upon approaching cars on No. 3 switch, and when only a car length away, White saw, for the first time, the hopper car. He shone his lantern light on the car. In the brief interim he had to act, he concluded it was in the clear. He therefore made no effort to stop the engine. The clearance, however, proved insufficient by 2 or 3 inches. The engine cab was torn off by the sideswipe, and fireman Taylor was injured.

"Engineer Thomas immediately stopped the engine. He ran to the fireman's side and found plaintiff had been thrown to the ground. Plaintiff was rushed to the hospital in an ambulance. He suffered temporary injuries and his right leg was severely crushed. It had to be amputated above the knee.

"Fifteen minutes prior to the accident, a Texas & Pacific switch engine delivered cars to defendant's yard. In so doing, it backed along the lead track, and cleared, without difficulty, the hopper car on No. 3 switch.

"The rear portion of engine 804's tender, the water tank, was round; whereas, the front portion next to the engine, the oil tank, was square. The oil tank was somewhat broader than the water tank. Just before the accident both engineer Thomas and fireman Taylor, plaintiff, heard a scraping noise. It was the upper rim and grab-iron, or hand-hold, of the hopper car scraping against the oil tank. The noise continued while the

engine ran 6 feet, the length of the oil tank. It ceased for a perceptible period, the time it took for the engine to run the length of the deck, before the hopper car grab-iron and rim struck the engine cab. The lead track at No. 3 switch was on a curve. As the engine rounded the curve, the left rear cab-corner projected two or three inches over the side of the lead track. It was this two or three inch protrusion that struck the hopper car grab-iron and rim.

"Plaintiff testified he was looking to the rear as the engine approached switch No. 3. He did not see the light from brakeman White's lantern. He did see brakeman Floyd's lantern, but it disappeared as the engine rounded the curve. The ceiling light over the engine deck was burning, and its rays spread over the oil tank portion, or rear, of the tender, as well as on the left side. Plaintiff stated this deck light blinded him.

"Defendant submits the judgment should be reversed because the court erred in giving plaintiff's instructions Nos. 1 and 4, and refusing defendant's instructions Nos. 8 and 10. Furthermore, the argument and remarks of plaintiff's counsel were flagrantly improper and highly prejudicial, and necessarily influenced the jury in returning the grossly excessive verdict."

Appellant insists that the judgment should "be reversed because the court erred in giving plaintiff's instructions Nos. 1 and 4, and refusing defendant's instructions Nos. 8 and 10. Furthermore, the argument and remarks of plaintiff's counsel were flagrantly improper and highly prejudicial, and necessarily influenced the jury in returning the grossly excessive verdict."

Plaintiff's instruction No. 1 above referred to reads as follows: "If you find from a preponderance of the evidence, under the instructions of the court, that plaintiff, W. E. Taylor, was injured while in the employment of the defendant, The Kansas City Southern Railway Company, and in the discharge of his regular duties, when both were engaged in interstate commerce, and

while he was at his post of duty as a fireman on a locomotive, and in the exercise of ordinary care for his own safety and that defendant acting through its servants other than plaintiff negligently spotted a cut of cars loaded with gravel at a point on switch number three in its yard at Texarkana, where they would not clear the locomotive on which plaintiff was working as it backed along the lead track in said yard; or that Brakeman L. M. White, or Brakeman DeLoss Floyd, failed to use ordinary care to discover that said gravel cars would not clear said locomotive or negligently signaled W. H. Thomas, engineer of said locomotive, to continue backing same along said lead track when it would not clear said gravel cars, until it collided with them; and that such negligence of the defendant or its servants, if any, was the proximate cause of the injuries, if any, sustained by plaintiff, then your verdict will be for the plaintiff, W. E. Taylor.''

Appellant's insistence is that this instruction is erroneous for the reason that brakeman White was guilty of no negligent act which proximately contributed to the injury, and cases are cited holding as does the case of *K. C. S. Ry. Co.* v. *Diggs,* 204 Ark. 150, 167 S. W. 2d 879, that ''. . . all acts of negligence charged and submitted to the jury must be supported by substantial testimony, and if not, reversible error is committed. This is true, because as said in *St. L.-S. F. Ry. Co.* v. *Lane,* 156 Ark. 465, 246 S. W. 494, 'Otherwise the jury might have found for plaintiff upon allegations of negligence of which there was no proof.' See other cases there cited.''

It remains, therefore, to determine whether or not the submission of the question of White's negligence was an abstract question supported by no testimony of a substantial nature. It will be remembered that while the ''back up'' signal was not first given by White, it was repeated by him. White was the brakeman nearest the engine, and it was upon White's signal that the engine began to back up. It was not necessary that White should repeat or continue to give this back up signal, as

it remained effective, after having been given, until it was annulled.

Now White himself testified as follows: "Somebody gave us a back up signal. I observed the signal and relayed it to the engineer. I only saw one back up signal. That signal meant to come on back down the lead track, and that conditions were safe to come on. That was what it was intended for. I had no other light besides my switchman's lantern as we approached the gravel car with which we collided. There was not a thing in the world between me as I stood there on the rear step of the tank car, and this gravel car to keep me from seeing it. I did see it approximately a car length before it collided with the locomotive. My idea of the car was it looked to be in the clear to me. That is all I can say. Naturally a brakeman had some idea whether the car was close or not, but I thought it was clear. I also thought it was fairly close; however I didn't give the engineer a signal to stop and investigate to see if it was close. I could have done that but I didn't. I had no thought of finding a car not in the clear at that point. I accepted the back up signal I saw and relayed it to the engineer, and the locomotive continued in the direction it was going until the collision.

"I was standing on the step on the engineer's side from the time I left the water tank until the impact. This track 3 was on the fireman's side as we backed up. After the accident I observed the position of this car we collided with. The lights of the conductor and brakeman were in a fairly close group near the head car of our pick up. All these lights were in my view and I had seen one back up signal from one of them. I do not know whose signal that was. It was pretty dark.

"In moving at night in a case like this, the only thing to do is stick the lantern out toward the object and if you think it is clear, all right; and if it is not, flag down. We use our judgment. I didn't go over and make the test, for it was my judgment that the car was clear. After plaintiff was taken to the hospital and I got back

down where the collision occurred, I went and measured and very much to my regret found that the car was not in the clear. I was thirty feet nearer the car we collided with as we approached it than the engineer and fireman. I could barely touch the car with my fingers when I made the test on it. When I consider that the rim and handle was on the car, it was not in the clear. It wasn't in the clear or the engine wouldn't have hit it.''

We think the jury was warranted in finding from this testimony that White had a duty to perform and that he was riding on the rear of the engine for the purpose of performing that duty. He was 30 feet nearer the car with which the engine collided than was either the engineer, or fireman. He saw the car with which the engine collided and the jury might have found, and, in fact did find, that if there were any doubt as to whether the engine would clear and not strike the car, ordinary care would have required that White give the engineer a stop signal (which he did not do) until he knew that the engine could pass the car without a collision. White testified that he thought that the engine would clear the car, but he was mistaken, and we cannot say that the jury should not have found that had White exercised ordinary care he would not have taken this chance. According to all the testimony the engine was moving at a speed of only 4 or 5 miles per hour, and could have been stopped almost immediately. We conclude, therefore, that instruction No. 1 was not abstract.

Instruction No. 8 asked by appellant would, if given, have told the jury that there was no evidence upon which a finding could be made that White was guilty of any negligence. It was for the reason just stated, properly refused.

Appellant's instruction No. 10, which was refused, was substantially to the same effect as instruction No. 8.

Appellee's instruction No. 4, to which objection was made, was on the measure of damages, if it were found that plaintiff was entitled to recover damages, and

authorized the jury to find and allow the value of an artificial leg, which appellee had purchased, but was unable to use for reasons later to be discussed. It is insisted that it was error to permit the jury to find and allow as damages the cost of the leg, which was $181. We think the inclusion of this item was proper, as it was part of the medical expenses.

Objections were made to certain arguments of appellee's counsel in presenting his case to the jury. Objections to these arguments were sustained when made, but it is insisted that notwithstanding that fact, they were calculated to induce the jury to return a verdict for a larger amount than would otherwise have been done, or than was authorized by the testimony. This brings us to a consideration of the question whether the verdict was excessive, and not sufficiently sustained by the evidence, and this is the difficult question in the case.

We have never sustained a verdict for a sum so large as the verdict in this case, for the mere loss of an arm or leg, and we would not do so here, if no other element of damages were shown. But not so. There are other elements of damage which must be considered. Appellee was all but killed and owes his life to his youth, his physique and fine physical condition. Pictures of appellee in the record show that he was a powerful, well built man. He was 33 years of age at the time of his injury, and had a life expectancy of 38.53 years. He was earning $300 per month at the time of his injury, and had the prospect of promotion to the employment of an engineer, with higher wages, as he was shown to have been a competent fireman, an occupation in which he can never again engage. He had only 8 months in a junior college, and had had no training which would enable him to earn a living, except with his hands, and according to the testimony in his behalf, he is incapacitated to do any ordinary manual labor.

The question of appellee's contributory negligence was submitted to the jury, and on this issue the jury was told that such negligence, if any were found, "goes by

way of diminution of the damages in proportion to his negligence as compared with the combined negligence of himself and the defendant, if any.'' Evidently the jury did not find that appellee was guilty of any negligence contributing to his injury, and that finding, if made, is fully sustained by the evidence.

The cab in which appellee was riding when the collision occurred was torn from the engine and appellee received the injuries presently to be discussed. His right leg was crushed and was twice amputated, first below and then 6 inches above the knee.

Four doctors testified in the case; two of these are surgeons in the employment of the railroad company, and they testified in its behalf. The other two were doctors engaged in private practice, who testified in behalf of appellee. There was no great difference in the testimony of these witnesses, as to conditions found, but the usual difference of opinion appeared when they testified as experts as to the prognosis of appellee's condition.

Appellee sustained a 4 inch fracture of the skull, and he complains of headaches and dizziness, and inability to sleep, and he has a large scar on his forehead. His collar bone was shattered and broken, and all the doctors admitted it is out of alignment. He sustained a broken rib and was badly bruised and sustained a great nervous shock.

One of the company doctors testified that the stump of appellee's leg had healed, although there was a rear tenderness which he thought could be remedied by a simple operation, and that appellee could thereafter use his artificial leg. It was shown, however, that appellee was unable to use his artificial leg. It could be availed only by the use of a strip attached to it which extended over his shoulder, but this strip extended over his broken collar bone and caused considerable pain. Appellee has crutches which he uses with difficulty, the difficulty being occasioned by the pressure of the crutch under his right arm which causes pain in the collar bone.

The point about which the doctors differed most widely was that of the treatment for the broken collar bone. One of the company doctors admitted that the X-ray pictures showed the fracture was not aligned but is united by callus and the arch of this callus as shown by the X-ray picture is apparent to one not familiar with the reading and interpretation of such pictures. The company doctors thought this could be relieved by a simple operation, but all the doctors were apparently agreed that the operation would be required before appellee could use his artificial leg or his crutches in a satisfactory manner. One of the doctors testifying in behalf of appellee stated that he was himself a surgeon, and that he would not advise the operation. He testified, "the callus in the bone in the shoulder will be there always. You can cut down on it, and fix these bones so you could have union, but I don't believe I would do it; I am a surgeon, but I would not have it done. The chances are you won't have a good bone."

Another reason why appellee cannot use his crutches is the condition of his right forearm and also that of his left hand. Tests made by the company doctors in the presence of the jury, by pricking plaintiff with pins, caused these doctors to admit that appellee was totally disabled at that time. One of the doctors stated that rest and cessation of the attempt to use the crutch was the only thing he could recommend to relieve this condition, but he admitted this condition might be permanent. Appellee has a tenderness in his back which a company doctor testified could be relieved by a minor operation. Appellee's doctors expressed the opinion that this condition was permanent.

Appellee abandoned all effort to use his artificial leg after trying to use it for 6 months and getting a fall which broke two bones in his hand. It is of some significance that appellee remained under the care of the company doctors from the time of his injury in February, until August and neither of them suggested the operations they now advise. In addition to his other handicaps

in using his crutches and artificial leg, it was shown that appellee has a partially paralyzed condition of his left hand and is unable to properly hold his crutches.

Without further review of the testimony, we announce the conclusion that it warranted the finding by the jury that appellee's condition is permanent and that he is wholly incapacitated to perform manual labor, and that his suffering has been and is even yet, very great.

We are unable, therefore, to say that the verdict is excessive. Upon the whole case we find no error, and the judgment must be affirmed, and it is so ordered.

MILLWEE, J., nonparticipating.